UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA ) | DOCKET NO. 3:14cr110 |
| ) | |
| ) | BILL OF INFORMATION |
| v. ) | Violations: |
| ) | |
| ) | 18 U.S.C. § 1347 |
| MARK TUAN LE ) | 18 U.S.C. § 1349 |
| ) | 26 U.S.C. § 7201 |

THE UNITED STATES ATTORNEY alleges:

At the specified times and at all relevant times:

1. From in or about 2009 to 2013, Dr. MARK TUAN LE attempted to defraud Medicare, Medicaid and private insurers of over $500,000 by submitting false and fraudulent claims stating that LE and his medical practice had performed certain procedures, namely hemorrhoidectomies and Enhanced External Counterpulsation (EECP) therapy, when these procedures were never performed. In one instance, LE claimed to have performed a hemorrhoidectomy and other procedures upon a patient who was comatose in a hospital in another county.

2. Furthermore, in or about 2009 and 2010, LE committed tax evasion by hiding approximately $2.4 million in personal income from the United States Internal Revenue Service (IRS). LE concealed these funds by falsely claiming that payments were business expenses of his medical practice when, in reality, LE used these funds to purchase and construct a $2.4 million 8,000-square foot residence on Lake Norman in Cornelius, North Carolina.

**Relevant Individuals and Entities**

3. Defendant MARK TUAN LE was a physician practicing general internal medicine from in or about 1997 until in or about June 2013, when the North Carolina Medical Board suspended LE's medical license.

4. LE owned, operated and practiced medicine at Northcross Medical Center, PC ("Northcross Medical"), which he incorporated in or about 2001.

5. LE employed numerous family members at Northcross Medical, including a relative (hereinafter co-conspirator #1 or CC #1), who functioned as an office manager for Northcross Medical.

6. CC#1 also operated a related business, hereinafter Company #1, which provided medical billing services for LE and Northcross Medical.

1

7. At all relevant times herein, LE was enrolled as an individual provider with Medicare and the North Carolina Division of Medical Assistance (hereinafter "Medicaid"), and his practice Northcross Medical was enrolled as a group practice with these programs.

8. At all relevant times herein, LE was enrolled as an individual provider with UnitedHealthcare ("United"), and his practice Northcross Medical was enrolled as a group practice with United.

9. LE was enrolled as an individual provider with Blue Cross and Blue Shield of North Carolina (BCBS NC) and his practice Northcross Medical was enrolled as a group practice with BCBS until February 29, 2012.

10. Medicare is a federally-funded health insurance program for people over age 65 and some persons under age 65 who are blind or disabled.

11. Medicaid is a joint federal-state program that provides health insurance coverage to certain categories of low-income individuals, including children, pregnant women, parents of eligible children, and people with disabilities. In North Carolina, the Medicaid program is administered by the North Carolina Department of Medical Assistance.

12. Medicare and Medicaid are both administered by the Center for Medicare and Medicaid Services ("CMS"), an agency of the United States Department of Health and Human Services.

13. Some beneficiaries may qualify for both Medicare and Medicaid. These beneficiaries commonly are called dual-eligible beneficiaries and both Medicare and Medicaid reimburse claims for medical and health services for these individuals.

14. BCBS NC is a private health insurance company operating in North Carolina which pays for medical services, products and prescription provided to its enrollees and whose activities affect interstate commerce.

15. BCBS NC is part of the Blue Cross and Blue Association, a national federation of Blue Cross and Blue Shield private health insurance companies. This Association includes members Anthem Blue Cross Blue Shield, Blue Cross Blue Shield of South Carolina and Blue Cross Blue Shield of Michigan

16. United is a private health insurance company operating in North Carolina which pays for medical services, products and prescription provided to its enrollees and whose activities affect interstate commerce.

17. Medicare, Medicaid, BCBS NC, the Blue Cross Blue Shield Association companies and United were each "health care benefit programs," as defined in Title 18, United States Code, Section 24(b).

## Schemes to Defraud

### A. EECP Treatments

18. From in or about 2009 to in or about 2012, LE and CC#1 engaged in a scheme to defraud Medicare, Medicaid and private insurers by falsely claiming that Northcross Medical had performed EECP treatments when those treatments had not been performed and, in most instances, were not medically necessary.

19. EECP treatments were recommended for patients who have chronic disabling angina, who do not receive adequate relief for angina by taking nitrates and who do not qualify as a candidate for invasive procedures, such as bypass surgery, angioplasty or stenting. Medicare, Medicaid and BCBS require a diagnosis of disabling angina as a condition of reimbursing claims for EECP treatments.

20. An operational EECP machine produces a tape or print out documenting the session and the outcome of the session. A typical regimen consisted of a maximum of 35 EECP treatments.

21. LE and Northcross Medical acquired an EECP machine in or about late 2008. Thereafter, LE's and other Northcross Medical physicians' referrals for EECP treatment skyrocketed. In most instances, the patient did not qualify for EECP treatment, but LE falsified the diagnosis code in order to obtain reimbursement.

22. CC#1 was primarily responsible for maintaining the EECP machine and sometimes administered EECP treatments at Northcross Medical. Additionally, CC#1 was primarily responsible, either directly or by directing other employees, for submitting claims to public and private insurers for EECP treatments.

23. From 2009 to 2013, LE, CC#1, Northcross Medical and Company #1 submitted false and fraudulent claims to Medicare, Medicaid and private insurance companies for EECP treatments that, in addition to being medically unnecessary, were not provided. Most of the fraudulent claims lacked any supporting documentation at all and many contained only a notation of the date of the alleged treatment without any supporting tape/print out indicating that the treatment actually occurred.

24. In some instances, the patient never received a single EECP treatment, yet LE, CC#1, Northcross Medical and Company #1 claimed to have provided thousands of dollars in EECP treatments to that patient. In many instances, the fake claimed treatments totaled hundreds of daily treatments far in excess of the 35 treatments recommended.

25. For example, LE and CC#1 submitted false and fraudulent claims for EECP treatments which were not rendered as follows:

    a. H.P. was LE's and CC#1's relative and was a dual-eligible Medicaid and Medicare beneficiary. Although LE claimed that he diagnosed H.P. with disabling angina, H.P. did not actually suffer from this condition. Indeed, when LE referred H.P. to another physician for knee replacement surgery, LE made no mention of a diagnosis of

disabling angina, which would have been important to the medical care that the other physician provided. Yet, LE falsified the diagnosis for H.P. so that LE and CC#1 could falsely bill for unnecessary and unrendered EECP treatments. From in or about 2010 to in or about 2012, LE, CC#1, Northcross Medical and Company #1 submitted false and fraudulent claims for approximately 300 EECP treatments that were never provided to H.P., totaling approximately $124,508.72.

  b. L.B. was LE's and CC#1's relative and was a Medicare beneficiary. From in or about 2011 to in or about 2013, LE, CC#1, Northcross Medical and Company #1 submitted false and fraudulent claims for approximately 300 EECP treatments that were never provided to L.B., totaling approximately $107,212.25.

  c. T.L. was a relative of a Northcross Medical employee and was a dual eligible Medicare and Medicaid beneficiary. From in 2012 to in or about 2013, LE, CC#1, Northcross Medical and Company #1 submitted false and fraudulent claims for EECP treatments that were never provided to T.L., totaling approximately $24,724.52.

  d. O.P. was a relative of a Northcross Medical employee and was a dual eligible Medicare and Medicaid beneficiary. From in or about 2010 to in or about 2013, LE, CC#1, Northcross Medical and Company #1 submitted false and fraudulent claims for approximately 350 EECP treatments that were never provided to O.P., totaling approximately $124,740.95.

  e. H.N. was a relative of a Northcross Medical employee and was a dual eligible Medicare and Medicaid beneficiary. In or about 2013, LE, CC#1, Northcross Medical and Company #1 submitted false and fraudulent claims for approximately 40 EECP treatments that were never provided to H.N., totaling approximately $8,105.41.

  f. H.L. was a relative of LE and CC#1. At relevant times, H.L. was a beneficiary of United and, later, BCBS NC insurance programs. In or about 2012, LE, CC#1, Northcross Medical and Company #1 submitted false and fraudulent claims to United for EECP treatments that were never provided to H.L., totaling approximately $12,498.60. Also in or about 2012, after H.L. switched to BCBS NC insurance, LE, CC#1, Northcross Medical and Company #1 submitted false and fraudulent claims to BCBS NC for EECP treatments that were never provided to H.L., totaling approximately $12,081.69.

  g. B.N. was a patient of Northcross Medical and was a dual eligible Medicare and Medicaid beneficiary. In or about 2013, LE, CC#1, Northcross Medical and Company #1 submitted false and fraudulent claims for 160 EECP treatments that were never provided to B.N., totaling approximately $32,425.05.

26. CC#1 also claimed to have received EECP treatments which never occurred. At relevant times, CC#1 was a beneficiary of BCBS NC and United. From in or about 2009 to in or about 2013, LE, CC#1, Northcross Medical and Company #1 submitted false and fraudulent claims to BCBS NC for EECP treatments that CC#1 did not receive and such treatments were not medically necessary, totaling approximately $28,796.94. From in or about 2011 to in or

4

about 2012, LE, CC#1, Northcross Medical and Company #1 submitted false and fraudulent claims to United totaling approximately $34,995.24.

### B. Hemorrhoidectomies

27. LE further defrauded insurance programs, including Medicare and BCBS, by submitting false and fraudulent claims for hemorrhoidectomies (the removal of internal and external hemorrhoids) which did not occur.

28. For example, on or about December 11, 2011, LE directed a medical biller to submit claims for an office visit, a hemorrhoidectomy and the removal of three skin lesions for patient R.B. allegedly occurring on November 14, 2011. Thereafter, Northcross Medical electronically submitted claims totaling $1,890 to Medicare seeking reimbursement for these alleged services. These services were never provided to R.B. on November 14, 2011 by LE. In reality, R.B. suffered cardiac arrest on November 13, 2011, and was admitted that same day to Wilkes Regional Medical Center, several counties away. On November 14, 2011 – the day that LE allegedly performed the hemorrhoidectomy and wart removal – R.B. was admitted to Forsyth Medical Center in a comatose state and died shortly thereafter.

29. Similarly, from in or about 2011 to in or about 2012, LE submitted and caused to be submitted the false claims to Medicare and private insurance companies for hemorrhoidectomies allegedly performed upon patients A.S., H.K., J.H. G.C. and P.H.

30. None of these patients ever had a hemorrhoidectomy performed. Nevertheless, LE submitted and caused to be submitted claims totaling $9,690 for these fake procedures.

### Financial Transactions and Tax Evasion

31. From in or about 2009 to in or about 2010, LE constructed his new 8,000 square foot personal residence on Lake Norman in Cornelius, North Carolina. LE employed Dienst Builders, LLC to build this multi-million dollar home.

32. During this same time period, LE employed an accountant to prepare his personal tax returns and the returns of Northcross Medical, which operated as an S corporation.

33. In or about 2009 and 2010, LE diverted approximately $735,833 from the Northcross Medical Suntrust Bank account *4782 to Dienst Builders to pay for his new personal residence. LE falsely told his accountant that these payments were business expenses for Northcross Medical, such as upfitting of the medical office and other renovations of the business.

34. In or about 2009 and 2010, LE also funneled approximately $1,708,864 from Northcross Medical Suntrust Bank Account *4782 to various companies and bank accounts controlled by LE, LE's brother and other conspirators. LE again falsely claimed to his accountant that these payments were for legitimate business expenses incurred by Northcross Medical. Instead, LE made payments or caused these companies and individuals to make payments to Dienst Builders to pay for the construction of LE's multi-million dollar personal residence.

5

35. LE made these false claims to his accountant for the purposes of evading the assessment of federal income tax on these funds. As a result of LE's false claims, LE's accountant classified these payments as business expenses for Northcross Medical.

36. LE then reported to the United States Internal Revenue Service that his taxable income for 2010 was a mere $40,142, resulting in a tax liability of $832.00. Similarly, LE significantly underreported his income in 2009 by fraudulently misclassifying personal income as business expenses.

37. In reality, LE had an additional income of approximately $1.2 million in 2010 and another $1.2 million in 2009 and, as a result of his scheme to defraud the IRS, LE evaded an additional tax of $423,751 in 2010 and $420,616 in 2009 for a total of $844,367 of evaded personal income taxes.

# COUNT ONE
# 18 U.S.C. § 1349
# (Health Care Fraud Conspiracy)

38. The United States Attorney re-alleges and incorporates by reference herein all of the allegations contained in paragraphs 1 through 37 of the Bill of Information, and further alleges that:

39. From in or about 2009 through in or about 2013, in Mecklenburg County, within the Western District of North Carolina, and elsewhere, the defendant,

MARK TUAN LE

knowingly conspired, confederated and agreed with others known and unknown to the United States Attorney to knowingly and willfully execute a scheme and artifice to defraud a health care benefit program and to obtain, by means of false and fraudulent pretenses, representations, and promises, any of the money and property owned by and under the custody and control of any health care benefit program, in connection with the delivery of and payment for health care benefits, items, and services, in violation of Title 18, United States Code, Section 1347.

All in violation of Title 18, United States Code, Section 1349.

## COUNTS TWO-EIGHT
## 18 U.S.C. § 1347
### (Health Care Fraud)

40. The United States Attorney re-alleges and incorporates by reference herein all of the allegations contained in paragraphs 1 through 37 of the Bill of Information, and further alleges that:

41. On or about the dates listed below, in Mecklenburg County, within the Western District of North Carolina and elsewhere, the defendant:

### MARK TUAN LE

did knowingly and willfully devise a scheme and artifice to defraud and to obtain by means of materially false and fraudulent pretenses, representations and promises, money owned by and under the custody and control of healthcare benefit programs, as defined in Title 18, United States Code, Section 24, in connection with the delivery of, and payment for, healthcare benefits, items and services by submitting and causing to be submitted false and fraudulent claims for hemorrhoidectomies and other services which were not provided:

| Count | Healthcare Benefit Program | Beneficiary | Claimed Date of Service | Approximate Date Claim Submitted | Amount Claimed | Amount Paid |
|---|---|---|---|---|---|---|
| 2 | BCBS of South Carolina | A.S. | 10/3/2011 | 2/14/2012 | $1,300.00 | $470.18 |
| 3 | Medicare | R.B. | 11/14/2011 | 2/14/2012 | $1,890.00 | $363.58 |
| 4 | BCBS of South Carolina | H.K. | 12/20/2011 | 2/14/2012 | $1,300.00 | $1040.00 |
| 5 | Anthem BCBS | J.H. | 3/13/2012 | 5/15/2012 | $1,300.00 | $523.95 |
| 6 | BCBS of South Carolina | H.K. | 4/6/2012 | 6/28/2012 | $1,300.00 | $1040.00 |
| 7 | BCBS of Michigan | G.C. | 6/14/2012 | 12/4/2012 | $1,300.00 | $910.00 |
| 8 | BCBS NC | P.H. | 9/27/2012 | 12/11/2012 | $1,300.00 | $521.98 |

8

Each transaction described above being a separate violation of Title 18, United States Code, Sections 1347 and 2.

9

Case 3:14-cr-00110-MOC   Document 1   Filed 06/13/14   Page 9 of 11

## COUNT NINE
## 26 U.S.C. § 7201
## (Tax Evasion)

42. The United States Attorney re-alleges and incorporates by reference herein all of the allegations contained in paragraphs 1 through 37 of the Bill of Information, and further alleges that:

43. On or about May 2, 2013, in the Western District of North Carolina, the defendant,

## MARK TUAN LE

a resident of Mecklenburg County, North Carolina, did willfully attempt to evade and defeat a large part of the income tax due and owing by him to the United States of America for the calendar year 2010, by filing and causing to be filed in Mecklenburg County, North Carolina with the Internal Revenue Service Center a false and fraudulent U.S. Individual Income Tax Return, Form 1040. In that false return, MARK TUAN LE falsely stated that his taxable income for the calendar year 2010 was the sum of $40,142, and that the amount of tax due and owing thereon was the sum of $832.00. In fact, as he then and there knew, his taxable income for the calendar year was the sum of $1,259,513 upon which taxable income there was owing to the United States of America an income tax of $423,751.

In violation of Title 26, United States Code, Section 7201.

## NOTICE OF FORFEITURE

Notice is hereby given of the provisions of 18 U.S.C. § 982 and 28 U.S.C. § 2461(c). Under section 2461(c), criminal forfeiture is applicable to any offenses for which forfeiture is authorized by any other statute, including but not limited to 18 U.S.C. § 981 and all specified unlawful activities listed or referenced in 18 U.S.C. § 1956(c)(7), which are incorporated as to proceeds by section 981(a)(1)(C). The following property is subject to forfeiture in accordance with section 982 and/or section 2461(c):

    a. all property which is proceeds of the violations set forth in this bill of information; and,

    b. in the event that any property described in (a) cannot be located or recovered or has been substantially diminished in value or has been commingled with other property which cannot be divided without difficulty, all other property of the defendant, to the extent of the value of the property described in (a).

The following property is subject to forfeiture on one or more of the grounds stated above:

    a. a money judgment in the amount of $191.921.52, such amount constituting the proceeds of the health care fraud conspiracy set forth herein.

ANNE M. TOMPKINS
UNITED STATES ATTORNEY

*(signature)*

KEILI H. FERRY
ASSISTANT UNITED STATES ATTORNEY